UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| ENUMERAL BIOMEDICAL ) | CHAPTER 11 |
| HOLDINGS, INC., *et. al.* ) | CASE NO. 18-10280 |
| ) | |
| Debtors.[1] ) | |
| ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL**

**(Expedited Determination Requested)**

Enumeral Biomedical Holdings, Inc. ("EBHI"), Enumeral Biomedical Corp. ("EBC") and Enumeral Securities Corporation ("ESC" and together with EBHI and EBC, the "Debtors"), each a debtor-in-possession in the above-captioned chapter 11 cases, hereby move, pursuant section 363(c)(2)(B) of the Bankruptcy Code, Fed. R. Bankr. P. 2002 and 4001, and MLBR 4001-2, for the entry of interim and final orders authorizing use of cash collateral in accordance with the budget attached hereto as Exhibit A (the "Budget"). By way of interim relief, the Debtors request entry of the proposed order annexed hereto as Exhibit B (the "Proposed Interim Order"). As grounds therefor, the Debtors state:

1.     On January 29, 2018, each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Petition Date"). The chapter 11 cases initiated by these petitions are referred to herein as the "Chapter 11 Cases."

---

[1] The debtors in these related chapter 11 cases, along with the last four digits of each debtors' federal tax identification number, are: Enumeral Biomedical Holdings, Inc. (6434), Enumeral Biomedical Corp. (9860), and Enumeral Securities Corporation (7157).

8945403v1

2.     With their respective petitions, the Debtors filed a motion for joint administration; accordingly, joint administration is in effect (subject to reconsideration) pursuant to MLBR 1015-1.

3.     The Debtors continue to manage their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     No request has been made for the appointment of a trustee or an examiner, and a creditors' committee has not yet been appointed in the Chapter 11 Cases.

## Background

### A.     The Debtor's Business

5.     EBHI, a publicly traded Delaware corporation, is a biopharmaceutical company focused on discovering and developing immunotherapies to help the human immune system fight cancer and other diseases.  EBC, a Delaware corporation and a wholly owned subsidiary of EBHI, was the primary operating entity prior to a 2014 reverse merger that allowed the company to go public under the EBHI name.  ESC, also a Delaware corporation and wholly owned subsidiary of EBHI, has since its formation been used solely in capital raising transactions and has never conducted business operations.

6.     Despite promising discoveries in its lead PD-1 program, EBHI was unable to generate sufficient cash necessary to finance operations.  Its search for additional capital in the first half of 2017 led EBHI to pursue a range of potential transactions, including reverse merger opportunities and licensing arrangements.  However, EBHI was unable to consummate a transaction that would allow it to continue as a going concern.

7.     On June 29, 2017, EBHI's board of directors, having evaluated and pursued a range of potential strategic transactions, determined that it was in the best interests of EBHI's

stakeholders to terminate its remaining operations and effect an orderly disposition of its remaining assets. On October 27, 2017, EBHI sold the assets associated with its TIM-3 program, including its TIM-3 patent application.

8. EBHI has now found a stalking horse buyer for its PD-1 related assets, which constitute substantially all of its remaining assets. The Debtors have filed the Chapter 11 Cases to allow EBHI to consummate this sale pursuant to sections 363 and 365 of the Bankruptcy Code (the "Proposed Sale"), and to conclude their affairs in an orderly manner. The Debtors intend to file a chapter 11 plan of liquidation for which they will seek confirmation following approval of the Proposed Sale.

9. As of the Petition Date, the Debtors had approximately $37,000 in the bank (the "Cash Collateral").[2] The Budget provides for approximately $38,000 of expenditures over the 13-week forecast period, all of them related to preservation of the Debtors' assets and performance of the Debtors' obligations in connection with the Proposed Sale. No salaries are being paid on a current basis to the Debtors' two remaining managers.[3]

B. **Potential Creditor Interests in the Debtors' Cash Collateral**

10. Intuitive Venture Partners, LLC, as collateral agent (the "Collateral Agent"), asserts a lien on intellectual property of EBHI and EBC, as security for payment of a series of convertible notes (the "Convertible Notes"). Though the face amount of the outstanding

---

[2] During the period before the Petition Date, the Debtors' funds were held and operations were conducted by EBC. For this reason, the Debtors are in the process of opening debtor in possession bank accounts in the name of EBC. However, all funds of EBC are traceable to the sale of assets of EBHI. For adequate protection purposes, the distinction between corporate entities should not matter since the lien held by the Collateral Agent, to the extent valid, extends to assets of both EBC and EBHI. As noted above, the Debtors intend to resolve intercorporate issues by effectuating substantive consolidation under their proposed plan.

[3] Their services are necessary through the closing of the Proposed Sale, and they will assert an administrative expense claim for their accrued compensation from the Petition Date through the sale closing. Thereafter, it is expected that they will continue to serve at reduced compensation for the brief period between the closing and confirmation of the Debtors' plan, at which time an experienced liquidation fiduciary will take responsibility for the remaining process of claims reconciliation and objections, making distributions of sale proceeds and any remaining Cash Collateral, and otherwise wrapping up the Debtors' affairs on an orderly basis.

Convertible Notes is $768,200, certain holders thereof have informed the Debtors that they will claim more than twice as much.

11. As explained below, the Convertible Notes and the security therefor are disputed. Moreover, the Debtors assert that the lien for the Convertible Notes, even if valid, does not extend to the Cash Collateral. However, the Debtors have filed this motion out of an abundance of caution in the event that the Collateral Agent does claim an interest in the Cash Collateral. No other creditor is known to assert a lien on assets of the Debtors.[4]

12. EBHI issued the Convertible Notes on May 19, 2017, pursuant to a Subscription Agreement with 15 accredited investors (the "Noteholders"), pursuant to which the Noteholders purchased 668 units of EBHI's securities for $1,000 per unit. Each unit consisted of: (i) a Convertible Note with a face value of $1,150, and (ii) a warrant to purchase 11,500 shares of EBHI's common stock, exercisable until five years after the date of the closing at an exercise price of $0.10 per share. In exchange for Convertible Notes with an aggregate face amount of $768,200, the Noteholders provided EBHI with gross cash proceeds of $668,000, which after deducting placement agent fees and transaction expenses netted EBHI approximately $548,000.

13. An Intellectual Property Security Agreement (the "Security Agreement") by and between EBHI and EBC as debtors and the Collateral Agent as secured party, purports to grant, as security for EBHI's obligations under the Convertible Notes, a first priority security interest in all now owned or after acquired "Intellectual Property" as that term is defined in the Security Agreement. In October 2017 the Noteholders amended the Security Agreement to release their lien on assets related to EBHI's TIM-3 program, which were subsequently sold for $300,000 in

---

[4] During the pre-petition period, EBHI maintained a revolving credit card account with Square 1 Bank with a $5,000 credit limit that was secured by the proceeds of EBHI's Square 1 Bank deposit account ending in x6371. As of the Petition Date, the outstanding balance on the revolving credit card account was zero. The Debtors are serving this motion on Square 1 Bank, but believe that Square 1 Bank has no interest in Cash Collateral.

cash. Since the TIM-3 asset sale was the Debtors' most recent source of cash and the Debtors' cash balance is significantly less than the sale proceeds, the Debtors assert that all cash on hand as of the Petition Date is traceable to the TIM-3 sale and thus free of any lien securing the Convertible Notes. *See, e.g., In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135, 150-52 (Bankr. D. Del. 2010) (burden on creditor claiming interest in debtor funds to trace funds by lowest intermediate balance test or other recognized method).

14. The Convertible Notes have a stated maturity date of 12 months, *i.e.*, May 19, 2018. Interest on the Convertible Notes is payable on the face amount of the Convertible Notes at the rate of 12% per annum, increasing to 15% upon default. Interest accrues and is payable in shares of EBHI's common stock. At the option of each Noteholder, the Convertible Notes are convertible into shares of EBHI's common stock at any time after November 19, 2017 (earlier if a registration statement is declared effective by the SEC, which did not happen). This option has not been exercised by any Noteholder. On a mandatory basis, the Convertible Notes are convertible into common stock if EBHI completes a qualified financing (as defined in the Convertible Notes). If conversion has not taken place by the maturity date of May 19, 2018, the Convertible Notes (together with all accrued and unpaid interest thereon) by their terms automatically convert into shares of EBHI's common stock.

15. The Convertible Notes also contain certain provisions whereby they would be payable in cash rather than common stock. The Convertible Notes are payable in cash if redeemed by EBHI prior to the maturity date (no Convertible Notes have been redeemed). In a "liquidation, dissolution or winding up of [EBHI], whether voluntary or involuntary," the Convertible Notes by their terms are payable at a 24% premium. Further, in the event of a Sale of EBHI (as such term is defined in the Convertible Notes and which includes a sale of "all or

substantially all of [its] assets determined on a consolidated basis," the terms of the Convertible Notes provide for a 100% premium, if so elected by the Noteholder, and payable either in cash or in the equivalent amount of securities of the acquiring entity, at the acquiring entity's discretion. In each case, the premium is computed not only on the principal amount of the Convertible Note but also on accrued interest. To the extent that the Noteholders assert that interest and/or any of the premiums just described would be payable in cash, it is evident that such requirement violates the Massachusetts usury law. The Noteholders have not filed the usury notification letter with the Massachusetts Attorney General's office that would have been necessary to exempt themselves from the law's restrictions.

16. In prepetition discussions with certain Noteholders, they asserted entitlement, upon sale of EBHI's remaining assets, to the 100% premium just described, which they compute to yield a total payment of $1,676,650. EBHI disputes, *inter alia*, the amount of the Noteholders' claims, the interest rate thereon, the applicability and enforceability of the premiums described above, the validity of the purported lien on EBHI's assets, their entitlement to be paid in cash, and their purported character as debt rather than equity. EBHI expects (working in cooperation with any official creditors' committee formed in the Chapter 11 Cases) to seek an order of this Court disallowing, avoiding, subordinating and/or recharacterizing as equity the claims asserted by Noteholders.

17. Notwithstanding the foregoing dispute affecting, among other things, the validity of any lien the Collateral Agent might assert on Cash Collateral, the Debtors propose below a form of adequate protection that would be fully sufficient even if the liens securing the Convertible Notes were valid.

**C.    Proposed Sale of EBHI Assets to XOMA**

18.    Concurrently herewith, EBHI has filed the *Debtor's Motion to Authorize Sale of Property Free and Clear of All Liens, Claims and Other Interests* (the "Sale Motion"), pursuant to which EBHI seeks this Court's authorization for the Proposed Sale, whereby EBHI has agreed to sell, free and clear of liens, the assets related to its anti-PD-1 antibody program, for $1,600,000 in cash, subject to higher or better offers. The assets that are the subject of the Proposed Sale are more particularly described, and defined as the Purchased Assets, in the Asset Purchase Agreement (the "Purchase Agreement") by and between XOMA Corporation (the "Purchaser") and EBHI dated January 26, 2018, a copy of which is attached to the Sale Motion. Pursuant to the Purchase Agreement, the Purchaser has paid EBHI a deposit of $160,000 (the "Deposit") to be credited against the ultimate purchase price if Purchaser is the successful bidder. If Purchaser is named the successful bidder but fails to close, the Deposit will be retained by EBHI as liquidated damages.

19.    Concurrently herewith, EBHI has also filed the *Debtor's Motion for Approval of Bidding Procedures*, seeking this Court's approval of bid procedures for the Proposed Sale. In summary, the proposed bid procedures seek to maximize the value received by the estate for the Purchased Assets through solicitation of higher or better offers for the Purchased Assets, and if any are received, an opportunity for each offeror to submit a final sealed bid.

**Jurisdiction**

20.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

21. The statutory predicates for the relief requested in this motion are sections 363(c)(2)(B) and 363(b) of the Bankruptcy Code, Fed. R. Bankr. P. 4001 and MLBR 4001-2.

**<u>Basis for Use of Cash Collateral</u>**

22. As described above, the Debtors commenced the Chapter 11 Cases in order to allow EBHI to sell substantially all of its remaining assets pursuant to section 363 of the Bankruptcy Code. While the Debtors no longer operate an active business, they require the use of Cash Collateral during the Chapter 11 Cases for limited expenses necessary to preserve their assets and complete the sale process. As detailed in the Budget, the Debtors estimate that they require the use of approximately $38,000 over the entire initial 13-week budget period.

23. Section 363(c)(2) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "may not use, sell or lease cash collateral under paragraph (1) of this subsection unless . . . (A) each entity that has an interest in such cash collateral consents; or (B) the Court, after noticing a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A) and (B). A hearing on a debtor's motion for use of cash collateral "may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor." 11 U.S.C. § 363(c)(3); Fed. R. Bankr. P. 4001(c)(2).

24. Pursuant to this motion, the Debtors seek this Court's approval for the use of the Cash Collateral on the terms specified in the Proposed Interim Order. Specifically, to the extent that the Convertible Noteholders have a valid lien on the Cash Collateral and are entitled to adequate protection, the Debtors propose granting them adequate protection as follows: (1) replacement liens on the same types of post-petition property of the Debtors' estates against which they held liens as of the Petition Date (the "Replacement Liens"), but only to the extent of

any post-petition diminution in the value of the Collateral Agent's pre-petition collateral resulting from the Debtors' use of the Cash Collateral; and (2) a lien on the Debtor's contingent right to the Deposit under the terms of the Purchase Agreement, but only to the extent of any post-petition diminution in value of the Collateral Agent's pre-petition collateral resulting from the Debtors' use of the Cash Collateral, and only after accounting for the value of the Replacement Liens (the "Deposit Lien").

25.     Disregarding for this purpose the dispute over the Noteholders' claims and liens summarized above, the value of their liens, if valid, will increase as a result of the Chapter 11 Cases.  Before the Petition Date, the Noteholders held a lien on illiquid intellectual property.  Commencement of the Chapter 11 Cases and, in particular, the Proposed Sale will benefit the Noteholders by accomplishing the near-term liquidation of their collateral on favorable terms established by the Purchase Agreement and the proposed bid procedures.  Cash Collateral will be used sparingly under the Budget, and all expenses are related to preserving the Debtor's assets and executing the Proposed Sale.  In the scenario where the Proposed Sale closes, any decrease in Cash Collateral to pay expenses will be more than offset by the resulting increase in the value realized from the non-cash collateral, which the Noteholders will capture (for adequate protection purposes) through the Replacement Liens.  Conversely, in the scenario where the Proposed Sale does not close and the Deposit is retained by the estate, the Deposit Lien supplies an effective form of adequate protection.

26.     Finally, it is worth noting that the Replacement Liens and the Deposit Liens serve the sole purpose of bridging the gap in time between when the Debtor needs to expend funds and when it can obtain an order of this Court, or agreement of the Collateral Agent, charging the expenditures against the Noteholders' collateral under section 506(c) of the Bankruptcy Code.

27. The Debtors respectfully submit that granting the Replacement Liens and Deposit Liens pursuant to the terms of the Cash Collateral Order will supply adequate protection fully complying with the requirements of the Bankruptcy Code.

### Basis for Expedited Treatment

28. Because the Debtors require use of the Cash Collateral to pay expenses necessary to preserve their assets during the bankruptcy proceeding, the Debtors respectfully request that this Court (a) hold a hearing this week to consider interim use of Cash Collateral, and (b) at that hearing, set an objection deadline and hearing date for final use of Cash Collateral.

### Notice

29. The Debtors will serve a copy of this motion by facsimile, email, overnight courier, or hand delivery on each of the following (except where such party will receive electronic service through the Court's ecf system): (a) all creditors of each Debtor, (b) all entities known to assert a lien on any Debtor's assets, (c) taxing authorities to which the Debtors are required to pay taxes or file a return, (d) the Office of the United States Trustee, District One, (e) all parties who have filed a notice of appearance in the Chapter 11 Cases, and (f) counsel to any official committee appointed in the Chapter 11 Cases. The Debtors submit that such notice is appropriate notice as to all parties in interest under the particular circumstances, and in light of the nature of relief requested herein.

WHEREFORE, the Debtors respectfully request that this Court enter an order, in the form attached hereto as Exhibit B, (a) granting on an interim basis the relief requested in this motion, (b) scheduling a final hearing on this motion, and (c) granting to the Debtors such other and further relief on this motion as the Court deems just and proper.

                              ENUMERAL BIOMEDICAL HOLDINGS, INC.,
                              ENUMERAL BIOMEDICAL CORP.
                              ENUMERAL SECURITIES CORPORATION

                              By their proposed attorneys,

                              */s/ Daniel C. Cohn*
                              Daniel C. Cohn, Esq. BBO #090780
                              Jonathan M. Horne, Esq. BBO #673098
                              Murtha Cullina LLP
                              99 High Street, 20th Floor
                              Boston, MA 02110
                              (617) 457-4000 Telephone
                              (617) 482-3868 Facsimile
                              dcohn@murthalaw.com
Dated: January 29, 2018          jhorne@murthalaw.com