UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ENUMERAL BIOMEDICAL | ) | CHAPTER 11 |
| HOLDINGS, INC., *et. al.* | ) | CASE NO. 18-10280-FJB |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR DEBTORS'**
**FIRST AMENDED CHAPTER 11 PLAN DATED MARCH 14, 2018**

This Disclosure Statement has been submitted for approval to the United States Bankruptcy Court for the District of Massachusetts, but has not been approved.  Unless and until approved by the Court, at which time this legend will be removed, this Disclosure Statement may not be used to solicit acceptances of the Plan, or used or relied upon for any other purpose.  Blanks and (where the context indicates) brackets denote material that will be updated so that the final form of the Disclosure Statement reflects latest available information at the time of its approval.

## I.   INTRODUCTION

Enumeral Biomedical Holdings, Inc. ("EBHI"), Enumeral Biomedical Corp. ("EBC") and Enumeral Securities Corporation ("ESC"), each a Delaware corporation and debtor-in-possession in the above-captioned chapter 11 cases, provide this Disclosure Statement to all of their known creditors in order to supply the information you will need in exercising your right to vote upon the Debtors' First Amended Chapter 11 Plan dated March [ ], 2018 (the "Plan").[2]  A copy of the Plan is attached to this Disclosure Statement as Exhibit 1.  All terms defined in the Plan have the same meaning in this Disclosure Statement unless otherwise noted.

EBHI, EBC and ESC – which will be referred to in this Disclosure Statement as "the Debtors" – each filed a petition under chapter 11 of the United States Bankruptcy Code on January 29, 2018 (the "Petition Date").  The filing had two purposes.  First, the Debtors sought to utilize the chapter 11 process to obtain greatest value from sale of the Debtors' only substantial assets, consisting of patent rights and related intellectual property related to its PD-1 antibody program (the "PD-1 Assets").  Second, the Debtors sought to wrap up the Debtors'

---

[1] The debtors in these jointly administered chapter 11 cases, along with the last four digits of each debtors' federal tax identification number, are: Enumeral Biomedical Holdings, Inc. (6434), Enumeral Biomedical Corp. (9860), and Enumeral Securities Corporation (7157).

[2] This Disclosure Statement is also being supplied, as a matter of information, to creditors not entitled to vote, and to all persons that have requested notices in this Chapter 11 case.

affairs in an orderly way, including resolution of disputed claims with holders of 12% Convertible Secured Notes issued May 19, 2017 (the "Noteholders"). The Plan accomplishes both objectives, by implementing a compromise with the Noteholders – already approved by the Bankruptcy Court – whereby they will pay $847,000 to the Debtors (the "Noteholder Payment") and the PD-1 Assets will be transferred to an entity formed by the Noteholders. The Noteholder Payment will be used to fund a distribution to other creditors, after paying for the expense of the chapter 11 case. The Debtors project that General Unsecured Claims will be paid at the rate of __%. Creditors should carefully review this Disclosure Statement in order to understand the assumptions on which that forecast is based.

A ballot for your use in voting to accept or reject the Plan is enclosed. Instructions for completing and returning the Ballot are printed on the Ballot itself. ***In order for your vote to count, the original signed ballot must be received by the Debtors' counsel at the address stated on the ballot no later than 4:00 p.m., Eastern Daylight Time, on April [  ], 2018.***

**[TO BE ADDED WHEN DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT]** THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. HOWEVER, EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED ON INFORMATION SUPPLIED BY THE DEBTORS. WHILE THE DEBTORS HAVE DONE THEIR BEST TO ASSURE THAT THE INFORMATION IS CORRECT AND COMPLETE, IT IS IMPOSSIBLE TO REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.

No representations concerning the Debtors or the Plan are authorized other than as set forth in this Disclosure Statement. Although this Disclosure Statement describes the Plan in summary and in detail, it is recommended that you review the Plan itself for a definitive understanding of its terms.

**THE DEBTORS RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

## II.   SUMMARY OF THE PLAN

The Plan provides that, subject to paying the expenses of the chapter 11 case as determined by the Bankruptcy Court, all funds of the Debtors will be paid to their creditors.[3] These funds are almost entirely attributable to the Noteholder Payment. Instead of corporate managers and a board of directors, the Debtors will be under the control of a Plan Trustee – a fiduciary who acts for the benefit of creditors, under the supervision of the Bankruptcy Court.

The Plan provides for substantive consolidation of the bankruptcy estates of the three Debtors. This means that the three Debtors will be treated like a single legal entity for the

---

[3] In the unlikely event that, after paying in full all allowed claims of creditors, there are remaining funds of at least $100,000, such funds will be distributed *pro rata* to stockholders of record on March [__], 2018.

purpose of allowing claims and distributing funds to creditors. Each creditor of any one (or more than one) Debtor will have a single claim against the combined bankruptcy estate, which will receive a *pro rata* distribution based on the Allowed Amount of its claim.

If you supplied goods or services to any of the Debtors before the Debtors filed their chapter 11 petitions on January 29, 2018, and you have not been paid, then the amount you are owed is likely a General Unsecured Claim. If you filed a proof of claim with the Bankruptcy Court not later than the Bar Date of March 15, 2018, the Allowed Amount of your claim will be the amount you stated in the proof of claim, so long as no party files an objection to your claim.[4] If you did not file a proof of claim, the Allowed Amount of your claim will be the amount (if any) that the Debtors listed in their schedules of liabilities as the correct amount of your claim (not contingent, disputed or unliquidated). For more on the process of claims allowance, please see Section VII on pages [16-19] below.

The Debtors believe that the Plan provides general unsecured creditors with the best opportunity to realize the highest possible return on account of their Claims. Indeed, the projected distribution of __% under the Plan contrasts with a likely distribution of zero if the Plan does not take effect. Accordingly, the Debtors urge all creditors to vote to accept the Plan.

## III.    DESCRIPTION OF THE DEBTORS

### A.    Debtors' Corporate Structure and Business

EBHI is a publicly traded biopharmaceutical company focused on discovering and developing novel antibody immunotherapies to help the human immune system fight cancer and other diseases. EBHI was originally incorporated in Nevada on February 27, 2012 as Cerulean Group, Inc., and converted to a Delaware corporation on July 10, 2014. EBC is a Delaware corporation founded in 2009 as Enumeral Technologies, Inc. ESC is a Delaware corporation that was founded in 2014 and is wholly owned by EBHI. ESC was solely used in capital raising transactions and has never conducted business operations.

On July 31, 2014, EBHI and EBC completed a reverse merger whereby EBHI's wholly owned subsidiary Enumeral Acquisition Corp. merged with and into EBC. EBC was the surviving corporation and became EBHI's wholly owned subsidiary. All of the outstanding EBC stock was converted into EBHI common stock. EBHI completely discontinued its pre-merger business, instead conducting EBC's business operations as a publicly-traded company under the name Enumeral Biomedical Holdings, Inc. Also on July 31, 2014, EBHI closed a private placement offering of 21,549,510 units of securities at a purchase price of $1.00 per unit, with each unit consisting of one share of common stock and one five-year warrant to purchase a share of common stock at an exercise price of $2.00. EBHI has 300,000,000 authorized shares of common stock, of which 128,409,788 are issued and outstanding. EBHI's common stock is quoted on the over the counter markets under the symbol "ENUM."

---

[4] If an objection is filed, you will be sent a separate notice, and you will have an opportunity to respond. See Section VII(B), on page [17] below.

Beginning in 2011, EBC (EBHI's predecessor operating company) exclusively licensed from the Massachusetts Institute of Technology ("MIT") a proprietary microwell array technology platform (the "Platform License") that could be used to detect secreted molecules (such as antibodies and cytokines) and cell surface markers, at the level of single, live cells, so as to enable recovery of single, live cells of interest. EBHI's lead program focused on discovering and developing anti-PD-1 antibodies. PD-1 is a protein found on T cells (a type of immune cell) that limits a body's immune response. When PD-1 is bound to another protein called PD-L1, T cells are inhibited from killing other cells, including cancer cells. By hindering PD-1, an anti-PD-1 cancer treatment allows the body's own immune system to attack cancer cells. Before EBHI discontinued its research and development activities in June, 2017, the PD-1 program yielded 25 families of PD-1 antibodies, resulting in several patent applications.

In June 2016, EBHI entered into a Definitive License and Transfer Agreement (the "Pieris Agreement") with Pieris Pharmaceuticals, Inc. and Pieris Pharmaceuticals GmbH (collectively "Pieris"). Pursuant to the terms of the Pieris Agreement, EBHI licenses to Pieris specified intellectual property related to the PD-1 program for Pieris's potential development and commercialization of novel multi-specific therapeutic proteins in the field of oncology. In return, Pieris is obligated to make payments to EBHI if and when certain milestones are achieved, and potentially to pay royalties based on product sales. No milestone payments or royalties have been paid to date.

In addition to its PD-1 program, in early 2015, EBHI initiated screening for antibodies against the "T Cell Immunoglobin and Mucin Protein 3" commonly known as TIM-3 (the "TIM-3 Program"). The TIM-3 Program yielded 42 families of TIM-3 antibodies, and EBHI filed a patent application in connection therewith. On October 27, 2017, EBHI sold the assets associated with its TIM-3 Program, including the TIM-3 patent application, to Elpiscience Biopharmaceuticals, Inc. for $300,000.

### B.    Events Leading to Chapter 11

Despite promising discoveries in its PD-1 Program, EBHI was unable to generate sufficient cash to finance operations. Its search for additional capital in the first half of 2017 led EBHI to pursue a range of potential transactions, including reverse merger opportunities and licensing arrangements. However, EBHI was unable to consummate a transaction that would allow it to continue as a going concern.

In June 2017, following collapse of negotiations for a prospective transaction, EBHI's board of directors instituted cost-saving measures including elimination of EBHI's research and development function. EBHI netted $277,188 from an auction of its laboratory equipment completed June 21, 2017. Eight days later, having evaluated and pursued a range of potential strategic transactions, EBHI's board determined that it was in the best interests of EBHI's stakeholders to terminate its remaining operations and effect an orderly disposition of its remaining assets (the "Wind-Down Program"). In June 2017, the Debtors laid off all of their remaining employees except for Wael Fayad, Kevin G. Sarney, Matthew A. Ebert, Esq., and David Gelineau. Mr. Fayad resigned as President and CEO in connection with commencement of the Wind-Down Program. Mr. Sarney, the chief financial officer, was chartered as acting

chief executive officer to effectuate the Wind-Down Program with assistance from Mr. Ebert, the general counsel.  Mr. Gelineau, who reported to Mr. Sarney in the finance department, resigned in September 2017.

On August 23, 2017, MIT terminated the Platform License due to the Debtors inability to continue to fulfill their obligations thereunder.  On or about August 23, 2017, the landlord of the Debtors' premises provided notice of default and termination of the lease.  The Debtors vacated the leased premises and returned possession to the landlord.  The landlord set off the security deposit against amounts owed by the Debtors.  The Debtors are informed that the leased premises has been re-let to a new tenant.  While the landlord has filed a general unsecured claim for more than $1.5 million, the Debtors believe that the landlord's ultimate Allowed Claim, if any, will be substantially less than that amount.

After EBHI adopted the Wind-Down Program in June 2017, EBHI's management team and board members began contacting industry participants and other parties that they believed might have an interest in acquiring EBHI's assets, including the PD-1 assets.  From July 2017 to November 2017, EBHI also engaged in discussions concerning a possible reverse merger, with active discussions involving several separate potential partners.  The discussions failed because each potential partner insisted on new capital which EBHI was unable to raise.

Meanwhile, the marketing of EBHI's assets bore fruit.  As described above, EBHI sold its TIM-3 Program assets in October 2017.  EBHI also received serious interest in the PD-1 related assets from three separate buyers.  Further discussions resulted in offers from all three.  After evaluating the merits of each proposal and engaging in further negotiations, EBHI executed an Asset Purchase Agreement dated January 26, 2018 (the "Purchase Agreement") with XOMA US LLC ("XOMA") and filed these chapter 11 cases in order to proceed with the transaction under section 363 of the Bankruptcy Code and take advantage of any higher or better offer that the chapter 11 sale process might produce.

## C.    The Debtors' Liabilities

### 1.    The Noteholder Claims

On May 19, 2017, EBHI entered into a Subscription Agreement with the Noteholders, pursuant to which the Noteholders purchased 668 units of EBHI's securities for $1,000 per unit.  Each unit consisted of: (i) a 12% Senior Secured Promissory Note with a face value of $1,150, and (ii) a warrant to purchase 11,500 shares of EBHI's common stock, exercisable within five years after the date of the closing at an exercise price of $0.10 per share.  The Notes have an aggregate face amount of $768,200.  In exchange, the Noteholders provided EBHI with gross cash proceeds of $668,000, which after deducting placement agent fees and transaction expenses netted EBHI approximately $548,000.

An Intellectual Property Security Agreement (the "Security Agreement") by and between EBHI and EBC as debtors and Intuitive Venture Partners, LLC, as collateral agent for the Noteholders, purports to grant, as security for EBHI's obligations under the Notes, a first priority security interest in all now owned or after acquired "Intellectual Property" as that term is defined in the Security Agreement.  This lien asserted by the Noteholders is the only lien known by the

Debtors to be asserted against their assets. To permit the sale of assets related to EBHI's TIM-3 Program in October 2017, the Noteholders released their purported lien on those assets.

The Notes have a stated maturity date of 12 months, *i.e.*, May 19, 2018. Interest on the Notes is payable on the face amount of the Notes at the rate of 12% per annum, increasing to 15% upon default. Interest accrues and is payable in shares of EBHI's common stock. At the option of each Noteholder, the Notes are convertible into shares of EBHI's common stock at any time after November 19, 2017 (earlier if a registration statement is declared effective by the SEC, which did not happen). This option has not been exercised by any Noteholder. On a mandatory basis, the Notes are convertible into common stock if EBHI completes a qualified financing (as defined in the Notes). If conversion has not taken place by the maturity date of May 19, 2018, the Notes (together with all accrued and unpaid interest thereon) by their terms automatically convert into shares of EBHI's common stock.

The Notes also contain certain provisions whereby they would be payable in cash rather than common stock. The Notes are payable in cash if redeemed by EBHI prior to the maturity date (no Notes have been redeemed). In addition, in a "liquidation, dissolution or winding up of [EBHI], whether voluntary or involuntary," the Notes by their terms are payable at a 24% premium. Further, in the event of a sale of EBHI (as defined in the Notes and which includes a sale of "all or substantially all of [its] assets determined on a consolidated basis"), the terms of the Notes provide for a 100% premium, if so elected by the Noteholder, payable either in cash or in equivalent amount of securities of the acquiring entity at the acquiring entity's discretion. In each case, the premium is computed not only on the principal amount of the note but also on accrued interest.

Prior to the Bar Date, each of the Noteholders filed proofs of claim against the Debtors' estates in the aggregate amount of $1,691,776.42, an amount including the 100% sale premium just described. EBHI disputed, *inter alia*, the amount of the Noteholders' claims, the applicability and enforceability of the sale and liquidation premiums described above, whether the total return on the Notes violates the Massachusetts usury statute, the validity of the purported lien on EBHI's assets, whether the Notes are entitled to be paid in cash, and their purported character as debt rather than equity. However, the Noteholders' claims are being fully resolved through the Plan, which implements a settlement with the Noteholders described below (section IV(D), on pages [8-9]).

2.    **Employee Prepetition Priority Claims**

As of January 1, 2018, the Debtor's two remaining employees, Mr. Sarney and Mr. Ebert, agreed to forgo current payment of their salary in order to preserve cash. The Debtors continued to pay for their health insurance and other benefits prior to and during these chapter 11 cases. As of the Petition Date, Mr. Sarney had a claim for accrued but unpaid salary (including vacation pay) of $40,907.53, of which $12,850 is entitled to priority treatment under Bankruptcy Code § 507(a)(4), and Mr. Ebert had a claim for accrued but unpaid salary (including vacation pay) of $43,118.02, of which $12,850 is entitled to priority treatment. Mr. Sarney and Mr. Ebert also assert general unsecured claims under their respective employment contracts which include provisions for severance pay.

3.    **General Unsecured Claims**

On their Schedules the Debtors listed $752,400.59 in General Unsecured Claims that are not contingent, unliquidated or disputed. In addition, to date creditors have filed proofs of claim asserting General Unsecured Claims against the Debtors in the amount of $[_____]. Eliminating duplicates, it appears that creditors are asserting approximately [$_____] of General Unsecured Claims. Some of these claims may be Allowed in a reduced amount, or Disallowed. The process of assertion, allowance and disallowance of claims is described in Section VII on pages [16-19] below.

## IV.    THE CHAPTER 11 CASES

The Debtors filed their chapter 11 petitions on January 29, 2018, to allow EBHI to sell the PD-1 assets and wind up their business in an orderly way.

### A.    The Automatic Stay

Triggered by the Debtors' chapter 11 petitions, the automatic stay is essentially an injunction against collection activity by creditors, interference with the Debtors' possession of their assets, and similar activities. At the same time that creditors are barred from collecting prepetition claims, the Debtors are barred from paying them.

The purpose of the automatic stay is to assure an orderly bankruptcy process centralized in the Bankruptcy Court. Instead of pursuing collection lawsuits, creditors file proofs of claim with the Bankruptcy Court. Instead of determining creditors' rights through a race to the courthouse, similarly situated creditors are treated *pro rata*. Instead of dismembering the Debtors through foreclosures and sheriffs' sales, disposition of the Debtors' assets is determined through Bankruptcy Court orders entered after notice and an opportunity for all parties to be heard, or through a chapter 11 plan voted on by impaired creditors.

### B.    Cash Collateral Orders

Although the automatic stay has suspended demands on the Debtors' cash to pay prepetition claims, the Debtors have still needed to use cash to pay for post-petition expenses necessary to preserve the PD-1 Assets until the Plan is consummated. The Bankruptcy Code permits a debtor to use cash, deposit accounts and other liquid assets that are subject to a creditor's lien only with the secured creditor's permission or an order of the Bankruptcy Court. Typically such agreement or order can be obtained only by providing the secured creditor with what is called "adequate protection" – essentially, reasonable assurance that the value of its collateral position will not decline because the debtor's use of cash collateral.

The Noteholders are the only creditors that have asserted an interest in the Debtors' cash collateral. The Debtors assert that the cash collateral is free of liens because the Debtors' cash is attributable to proceeds from sale of the TIM-3 assets, on which the Noteholders released their lien. On January 29, 2018 the Debtors filed their *Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral* [Docket No. 9], requesting that the Bankruptcy Court allow

them to use cash collateral.  Through the Collateral Agent, the Noteholders assented to the
Debtors' interim use of cash collateral and the Bankruptcy Court entered an interim orders on
February 6 and 16, 2018.  The Debtors proposed, and following a final hearing on February 23,
2018, the Bankruptcy Court entered a final order which allowed the Debtors to use cash
collateral on the following terms:

- The Debtors' may use cash collateral in accordance with an agreed Budget, for a
  time period through April 27, 2018.

- The Debtors are required to provide monthly reports comparing their actual
  performance to the Budget.

- The Debtors are providing adequate protection to the Noteholders through a
  replacement lien on postpetition assets to the extent of any diminution in the value
  of the Noteholders' cash collateral resulting from the Debtors' use thereof, and
  only if such replacement liens are inadequate, a lien on the Debtors' contingent
  interest in the $160,000 deposit toward purchase of the PD-1 Assets, as described
  immediately below.

**C.**     **Motion to Sell PD-1 Assets to XOMA**

Along with their petitions commencing these chapter 11 cases, the Debtors filed a motion
to sell substantially the PD-1 Assets (constituting substantially all of Debtors' remaining assets)
free and clear of all liens, claims and other interests pursuant to section 363 of the Bankruptcy
Code.  The proposed purchaser was XOMA US LLC ("XOMA") for $1,600,000, subject to the
potential for receipt by the Debtors of a higher or better offer pursuant to a Court-approved
competitive bidding process requiring that any counterbid provide value to the Debtors of not
less than $1,680,000 (the "Minimum Counterbid Amount").  To induce XOMA to serve as
"stalking-horse bidder" and potentially lose the assets to someone else, the Debtors agreed – and
the Bankruptcy Court approved – payment of a break-up fee of $64,000 to XOMA if (in
summary) XOMA did not get the PD-1 Assets other than by reason of its own default.

The court-approved bid procedures set a deadline of March 14, 2018, for  submission of
additional offers for the PD-1 Assets (as well as objections to the proposed sale), and scheduled a
final hearing to consider approval of the  proposed sale on March 21, 2018.  In the meantime, the
Debtors reached a comprehensive settlement with the Noteholders (described immediately
below) involving transfer of the PD-1 Assets to their designee pursuant to a chapter 11 plan.
Concluding that the settlement provided a more favorable outcome for their creditors –
especially their general unsecured creditors – than the proposed sale followed by litigation of the
Noteholders' claim to be entitled to all of the sale proceeds, the Debtors withdrew the sale
motion on March [13], 2018, prior to the deadline for submission of counterbids or objections to
the proposed sale.

**D.**     **Noteholder Settlement**

The Noteholders are the Debtors' largest creditor constituency.  They assert that their
claims should be allowed in the amount of $1,691,776.42, and are secured by a lien on the PD-1

8

Assets. The Debtors disputed the claim on multiple grounds. These matters are described above in Section III(C)(1), on pages [5-6].

Even before the beginning of these chapter 11 cases, the Debtors engaged in negotiations with Noteholder representatives concerning the best approach to the PD-1 Assets – the sole remaining significant property of the Debtors. Negotiations intensified after commencement of the chapter 11 cases. The parties reached a comprehensive settlement embodied in the *Stipulation of Settlement With Noteholders* [Docket No. ___] (the "Noteholder Settlement"). In summary, the Noteholder Settlement provided for the Debtors to propose and the Noteholders to support a chapter 11 plan (a) requiring the Noteholders to make the Noteholder Payment of $847,000 to the Debtors, (b) transferring the PD-1 Assets to an entity formed by the Noteholders rather than sold to XOMA or someone else pursuant to the sale motion, (c) providing that this transfer would be in full settlement and satisfaction of the Noteholders' claims, and (d) providing for releases that extinguish all threatened and potential claims. (A detailed description of the releases can be found in Section X on pages [22-23] below.) In seeking the Bankruptcy Court's approval of the Noteholder Settlement, the Debtors explained that they viewed the settlement as compromising the Noteholders' claims at $833,000 – an amount representing principal plus accrued interest, at the non-default rate, through the date the chapter 11 cases commenced. Conversely, the Noteholders waived their rights under the terms of the Notes to receive a 100% premium based on sale of the EBHI's remaining assets, a 24% premium on account of liquidation of EBHI, a 3% increase in the interest rate on account of EBHI's admitted defaults, and continuation of interest accrual during these chapter 11 cases.

The compromise value of $833,000, when added to the $847,000 the Noteholders will pay in cash under the Plan, equals the Minimum Counterbid Amount of $1,680,000. The Noteholder Settlement thereby provides the Debtors with the same value as would have been provided by a counterbid to the proposed sale to XOMA. Of course, the bidding process might have produced an even greater sale price, but relinquishment of this entirely speculative benefit (at the time of the settlement, no one except XOMA had actually submitted a bid) seemed a small price to pay for the benefits of the Noteholder Settlement: (i) compromising the Noteholders' claims at a reasonable amount well within the range of potential litigation outcomes, (ii) elimination of the immense potential costs and delays inherent in litigation with the Noteholders, and (iii) certainty of a substantial distribution on account of allowed general unsecured claims. For these reasons, the Debtors' board and management unanimously concluded that the Noteholder Settlement was in the best interest of the Debtors' estates.

[The Bankruptcy Court entered an order approving the Noteholder Settlement on March __, 2018.] The Plan implements the Noteholder Settlement.

## V.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The Debtors' liabilities and shareholder interests, and their treatment under the Plan, are described below in the following order:

A.     **Secured Claims** of the Noteholders and/or Collateral Agent (Class 1).

    **B.**      **Claims Arising During the Chapter 11 Case** (Administrative Claims–Unclassified)

    **C.**      **Priority Non-Tax Claims** (Class 2)

    **D.**      **Priority Tax Claims** (Unclassified)

    **E.**      **General Unsecured Claims** (Class 3)

    **F.**      **Equity Interests – Common Stock** (Class 4)

**A.**      <u>**Secured Claims of Noteholders (Class 1)**</u>

A secured claim is a claim secured by property of the debtor (referred to as "collateral"), such that if the debtor defaults, the holder of the claim (the secured creditor) has the right under non-bankruptcy law to sell the collateral in order to pay the claim. In bankruptcy terminology, a secured claim is not necessarily the entire amount owed to the secured creditor. If a creditor is under-secured – that is, the value of the collateral falls short of the amount of the claim – the claim is considered a secured claim only to the extent of that value, and the balance will in most instances be treated as a general unsecured claim.

Noteholders have filed proofs of claim against the Debtors' estates in the aggregate amount of $1,691,776.42, which assert is secured to the full extent of the value of the PD-1 Assets or proceeds from selling those assets. Although the Noteholder Settlement resolves these claims on terms equating to less than half of this amount (see discussion of the Noteholder Settlement in Section IV(D) on pages [8-9] above), the settlement provides for allowance of these claims in the full asserted amount in order to induce the Debtors to abide by the Noteholder Settlement.

**B.**      <u>**Claims Arising During the Chapter 11 Case (Unclassified)**</u>

Administrative Claims are liabilities incurred during the Chapter 11 cases, including operating expenses, quarterly fees payable to the Office of the United States Trustee, and professional charges of the Debtors' counsel. Under the Bankruptcy Code, Administrative Claims are entitled to priority payment over all unsecured claims arising before the Petition Date and to be paid in full as a condition of confirming the Plan. Accordingly, the Plan provides that Allowed Administrative Claims will be paid in full, in Cash, on the Initial Distribution Date, except to the extent that the holder of an Administrative Claim agrees to other treatment.

The Plan establishes a deadline by which Administrative Claims must be properly asserted. **<u>Any claim entitled to priority under Section 507(a)(1) of the Bankruptcy Code shall be forever barred unless it is the subject of a proof of claim or request for payment (or, in the case of a professional person, a fee application) filed with the Court on or before the Postpetition Bar Date, which is the 20th day following entry of the Confirmation Order.</u>** Any claim that would be allowable as an Administrative Claim but for the fact that it arises after entry of the Confirmation Order is ***not*** subject to the Postpetition Bar Date but will instead be

treated as a Plan Expense, to be paid by the Plan Trustee if valid (see Section VII(C) on pages [17-18] below).

### 1.      Suppliers of Goods and Services

The Debtors have been paying when due their suppliers' invoices for goods and services provided since the Petition Date.  The Debtors believe they have received and paid substantially all invoices from suppliers.

### 2.      Employees

The Debtors' sole remaining employees are Mr. Sarney and Mr. Ebert.  Due to the Debtors' limited cash, both employees agreed to forgo payment of their regular salaries during the chapter 11 cases, with all amounts to be paid as an administrative claim under the Plan.  Both Mr. Sarney and Mr. Ebert continue to be full-time employees of the Debtors and are expected to remain so until the Plan is confirmed.  The Plan provides for the payment in full on the Initial Distribution Date of amounts owed to Mr. Sarney and Mr. Ebert for their services during the chapter 11 cases, which amounts are [estimated (based on a projected Plan confirmation date of March [  ], 2018) to be $[  ] and $[  ], respectively].

### 3.      Professional Persons

The Debtors estimate that the following amounts for fees of professionals (together with reimbursement of associated expenses) and quarterly fees to the United States Trustee will be due on the Effective Date[5]:

| | |
|---|---|
| Murtha Cullina LLP<br>Counsel to the Debtors | $[ _____ ] |
| United States Trustee Quarterly Fees | $[ _____ ] |
| **TOTAL** | $[ _____ ] |

### 4.      Breakup Fee

The Debtors' agreement to sell the PD-1 Assets to XOMA required the Debtors to pay XOMA a breakup fee of $64,000 if the Debtors sold the assets to someone else.  Since the Plan (implementing the Noteholder Settlement) provides for the assets to be transferred to an entity formed by the Noteholders, the Plan provides for payment of the breakup fee to XOMA on the Initial Distribution Date.

### C.      Priority Non-Tax Claims (Class 2)

Claims entitled to priority under the Bankruptcy Code, other than claims for taxes, are

---

[5] Additional fees will be incurred to wrap up the Debtors' affairs and administer the Plan, which will be included as part of the Plan Expenses.

placed in Class 2. The Debtors' books and records indicate that the only such claims are the salary claims of Mr. Sarney and Mr. Ebert. Section 507(a)(4) accords priority – but only to the extent of $12,850 for each individual[6] – to claims for wages, salaries or commissions earned within 180 days prior to the Petition Date. As of the Petition Date, Mr. Sarney and Mr. Ebert had claims for accrued but unpaid prepetition salary (including vacation pay) within the prior 180 days, of $40,907.53 and $43,118.02, respectively. Thus, the Plan provides that Mr. Sarney and Mr. Ebert will each receive a payment of $12,850 on the Initial Distribution Date in satisfaction of their respective Allowed Non-Tax Priority Claims.

The portion of their claims for unpaid prepetition salaries not entitled to priority will be treated as General Unsecured Claims under the Plan.

### D.      Priority Tax Claims (Unclassified)

Claims entitled to priority under Section 507(a)(8) of the Bankruptcy Code include most taxes arising before the chapter 11 case. The Debtors owe $1,957.48 to the Commonwealth of Massachusetts for corporate excise taxes assessed on June 29, 2017, which will be paid in full on the Initial Distribution Date. The Internal Revenue Service has also filed a proof of claim for $200.00. The Debtors' records indicate that no other taxes are owed. Consequently, even though governmental units have until July 28, 2018, to file proofs of claim, no such claims are expected.

### E.      General Unsecured Claims (Class 3)

Unsecured Claims not entitled to priority under the Bankruptcy Code are called "general unsecured claims." If you supplied goods or services to any of the Debtors before the Petition Date and you have not been paid, then the amount you are owed is probably a General Unsecured Claim. (The Petition Date, when the Debtors filed their respective petitions commencing their chapter 11 case, was January 29, 2018.) The Plan places General Unsecured Claims in Class 3.

In order to be Allowed, your General Unsecured Claim must either (1) be listed by the Debtors in their Schedules filed with the Bankruptcy Court as a liability that is not disputed, unliquidated or contingent, or (2) be set forth in a proof of claim that was properly filed with the Bankruptcy Court on or before the Bar Date, which [was] March 15, 2018.[7] Any such claim will be deemed Allowed unless an objection to the claim is filed – in which case you will receive notice and an opportunity to respond – and the Claim is then Disallowed by Order of the Bankruptcy Court. The process for allowance of Claims is described in greater detail below (see Section VII on pages [16-19]).

---

[6] This seemingly arbitrary figure is the result of a mechanism adopted by Congress for automatic adjustment, based on a cost-of-living index, of the priority ceiling for employee compensation and benefits.

[7] However, a bar date of July 28, 2018 applies solely to claims of governmental units.

If you hold an Allowed General Unsecured Claim, you will receive a Pro Rata Share of funds determined to be available for general unsecured creditors.  The starting point for this determination is the amount of Estate Funds, which are first used to pay Priority Claims arising before the Confirmation Order and expenses of the Plan Trustee in administering the case after the Confirmation Order ("Plan Expenses").   Remaining funds are to be distributed *pro rata* to holders of Allowed General Unsecured Claims.  You will be entitled to payment as funds become available or, if later, when your claim is Allowed.  Please note that your General Unsecured Claim will be treated the same no matter which of the Debtors (or more than one) is liable for your claim.[8]

As noted above (see Section III(C)(3) on page [7]), General Unsecured Claims of approximately [$_____] have been asserted.  Largely because the Debtors expect the claim of their former landlord to be disallowed in full, the Debtors project $_____ as the aggregate Allowed Amount of General Unsecured Claims.  The Debtors expect that approximately $[  ] will be available for distribution on account of Allowed General Unsecured Claims.  Accordingly, the Debtors project that if your General Unsecured Claims is Allowed, you will receive a distribution of about __% of the Allowed Amount.  The Debtors caution that, as in the case of all forecasts, this projection is subject to uncertainty, especially because the courts rather than the Debtors will ultimately determine whether a disputed claim is Allowed.

The Plan provides that, if Distributable Funds are sufficient to pay 100% of the Allowed Amount of each General Unsecured Claim, then each holder of such a claim will also receive interest at the federal judgment rate from commencement of the chapter 11 cases until shortly before the 100% payment is made.  The Debtors caution, however, that a payment percentage of 100% is very unlikely.

General Unsecured Claims are "impaired," in bankruptcy terminology, because they are not assured of payment in full plus interest.  As such, holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.  ***The Debtors urge general unsecured creditors to vote to accept the Plan as being the best means of providing the greatest and earliest possible distribution on account of General Unsecured Claims.***

**F.    Equity Interests – Common Stock (Class 4)**

---

[8] The reasons for this are explained in Section VI(C), on page [14] below, concerning Substantive Consolidation.

There are 128,409,788 outstanding shares of EBHI common stock which has traded on the over-the-counter markets under the symbol ENUM.  There are also various outstanding warrants and stock options, which are "out of the money" in the sense that the exercise price exceeds any likely value that would be attributed to the stock.  The Plan provides for EBHI's stock to be cancelled on the Effective Date.[9]

## VI.    MEANS OF IMPLEMENTATION

### A.    Effective Date

The day that the Plan will take effect is defined in the Plan as the "Effective Date."  The Effective Date is scheduled to occur two business days following entry of the Confirmation Order (provided that the Confirmation Order remains in full force and effect, not having been stayed, vacated or reversed by any court).

### B.    Asset Disposition

The Plan provides that on the Effective Date, in consideration of the Noteholder Payment and discharge of the Class 1 Claims, the Debtors (through the Plan Trustee) will transfer the PD-1 Assets, and assume and assign the Pieris Agreement, to an entity owned and controlled by the Noteholders.

The Noteholder Payment, consisting of $847,000 in cash, is currently being held in escrow by Delaware Trust Company, a third party escrow agent, pursuant to the terms of an escrow agreement.  On the Effective Date, the Noteholder Payment will be released from escrow and become Estate Funds available for distribution under the Plan to the Debtors' creditors.

### C.    Substantive Consolidation

Although formed as separate and distinct legal entities, the Debtors generally operated as a single corporate enterprise.  Thus, while EBHI owned the valuable intellectual property assets of the combined Debtors, EBC maintained the primary operating account used to pay employees and certain vendors, and was licensee under the Platform License from MIT.  The Debtors do not know of any liabilities of any of the Debtors that could not plausibly be asserted as liabilities of the entire group.  Thus, for reasons of fairness and to avoid the expense of establishing the particular Debtor or Debtors responsible for each claim, the Plan provides that the Debtors estates will be substantively consolidated.  This means that they will be treated as a single legal entity for the purpose of allowing and paying creditors' claims.

---

[9] In order to respect the rights of shareholders, the Plan provides that if Distributable Funds exceeding $100,000 remain after paying all creditor claims plus interest, the funds will be distributed *pro rata* to stockholders of record on the Effective Date, disregarding warrants, options and the like.  However, it is very unlikely that any such distribution will occur.

D.    **Plan Trustee**

The Plan provides for the Debtors' bankruptcy estates to continue as a single substantively consolidated estate, protected by the automatic stay, until the estate is fully administered and the Chapter 11 case is closed.  For the fair, efficient and economic administration of the estate, the Plan provides for appointment of a Plan Trustee who will assume control of the Debtors upon entry of the Confirmation Order, supplanting the powers and duties of the directors and officers.  The key functions of the Plan Trustee are to make distributions to creditors, object to claims to the extent necessary, and wrap up the Debtors' affairs, including filing final tax returns and closing the chapter 11 cases.  Keith D. Lowey of the accounting firm of Verdolino & Lowey, P.C., will serve as Plan Trustee.  Mr. Lowey's extensive experience in insolvency matters, including winding down hundreds of businesses and serving as a court-approved professional in hundreds of bankruptcy cases, positions him to capably and efficiently serve as Plan Trustee.

The Plan Trustee will make distributions to holders of Allowed Claims on the Initial Distribution Date or as soon as practicable thereafter, while maintaining sufficient funds to pay in full, or a Pro Rata Share (as appropriate), on account of any claims then subject to an objection.  The Plan Trustee may settle Unresolved Claims; approval by the Bankruptcy Court will only be required if the Claim was asserted for $100,000 or more.

To assist in discharging his duties, the Plan Trustee will have the authority to engage professionals, such as lawyers or accountants.  In his discretion, these professional persons may include those who have previously served the Debtors.  The Plan Trustee and professional persons he employs will be entitled to reasonable compensation and reimbursement of customary expenses as provided in the Plan.  These Plan Expenses, along with the Plan Trustee's own compensation, are expected to be the primary expenses of administering the Plan.  Holders of unpaid claims will have the right to object to fees of the Plan Trustee and any professional persons he employs.

The Plan Trustee will have no personal liability for his acts or omissions except in the event of gross negligence or willful misconduct.  The Plan provides that no bond will be required of the Plan Trustee.

E.    **Avoidance Actions**

The Bankruptcy Code confers on chapter 11 bankruptcy estates the right to avoid certain pre-bankruptcy transfers and obligations of the debtor.  Among these are "preferential transfers" and "fraudulent transfers."

A preferential transfer is, in concept, a transfer that permits a creditor to collect more than others who are similarly situated.  The legal requirements for a recoverable preferential transfer are, in summary, that the creditor have received the transfer within 90 days (one year if the creditor is an insider of the debtor) before the bankruptcy filing, that the debtor was insolvent at the time, and that the transfer enabled the creditor to realize a higher percentage of its claim than it would have received if the debtor had gone into chapter 7 bankruptcy at the time of the

transfer.  The bankruptcy law recognizes various defenses, most notably, that (i) the transfer was made in the ordinary course of business, or (ii) after receiving the otherwise avoidable preferential transfer, the creditor supplied new goods or services for which the creditor did not get paid.

A fraudulent transfer is, in summary, a transfer by the debtor with the intention of hindering, delaying or defrauding creditors (an "actual fraudulent transfer") or a transfer, regardless of the debtor's intention, made for less than reasonably equivalent value at a time when the debtor was insolvent or otherwise in financial distress.  The Bankruptcy Code provides its own lookback period of two years before the bankruptcy petition for a transfer to be avoidable as fraudulent, but permits the debtor to utilize longer statutes of limitation provided by non-bankruptcy law.

The Plan Trustee will investigate whether the Debtors made any preferential or fraudulent transfers for which there is a reasonable prospect of recovery.  The Debtors view as potentially recoverable their former landlord's application of their security deposit, in the amount of $529,698.78, to the landlord's alleged damages for EBHI's  breach of its lease, to the extent that the security deposit exceeded the landlord's actual damages.   There may be other avoidable transfers as well.  Proceeds of any recoverable transfers, after litigation expenses, would provide additional Distributable Funds to pay General Unsecured Claims.  The Plan preserves the right of the Plan Trustee, on behalf of the bankruptcy estate, to recover all avoidable transfers whether or not specifically identified in this disclosure statement.  The Plan Trustee may settle avoidance litigation; approval by the Bankruptcy Court will only be required in the case of a transfer of $100,000 or more.

## VII.    ASSERTION AND ALLOWANCE OF CLAIMS

### A.    How to Assert a Prepetition Claim

No Claim will be paid unless it is Allowed.  In order to be Allowed, a Claim must first be asserted.

A Claim arising before the Petition Date, or for damages under a contract with the Debtors made before the Petition Date, is asserted in either of two ways.  First, your claim has been deemed asserted if it was listed in the Schedules that the Debtors filed with the Court as an obligation that is not disputed, unliquidated or contingent.  If your Claim was so listed and you agreed with the amount listed in the Schedules, then you needed to do nothing further to assert your Claim.

The second way of asserting a Claim was to file a proof of claim with the Bankruptcy Court before the deadline for filing proofs of claim, known as the Bar Date. The Debtors sought and obtained from the Bankruptcy Court an Order setting a Bar Date of March 15, 2018 for non-governmental claims and July 28, 2018 for claims of governmental units.  The Debtors served upon all creditors a Notice of the Bar Date.  The Bar Date was the deadline for filing a proof of claim if your claim was not listed in the Schedules, if you disagreed with the amount or any other aspect of how your claim was listed in the Schedules, or if your claim was listed in the Schedules as disputed, unliquidated or contingent.  If you were required to file a proof of claim on or before

the Bar Date but did not do so, your Claim is forever barred as a Claim against the Debtors except under very special circumstances prescribed by the courts.

If you are a party to a contract or lease with the Debtors that was not performed or terminated before the Petition Date and has not been rejected by Order during the chapter 11 case, the Plan provides for that executory contract or unexpired lease to be rejected (see Section IX, on page [20] below).  In that event, the deadline for filing your damage claim (if any) will be the Postpetition Bar Date.

### B.    Allowance of Prepetition Claims

No Claim will be entitled to payment under the Plan unless it is Allowed.  The Debtors reserve the right to object to any Claim on any legal basis.  This duty and authority to object to Claims will pass to the Plan Trustee when appointed.

Any Claim that has been properly asserted (as described in the preceding Section) will automatically be Allowed unless an objection is filed.  If an objection is filed to your Claim, you will be sent a notice explaining the grounds for the objection and what you must do if you wish to contest the objection.  The Allowed Amount of any Claim to which an objection and a timely response thereto are filed will be determined by the Court.

If you do not receive notice of an objection, your Claim has been or will be Allowed in its properly-asserted amount, and then paid in accordance with the Plan, provided that the Plan Trustee has your correct current mailing address (see Section VIII, on pages [19-20] below).

### C.    Postpetition Claims

A Claim arising on or after the Petition Date through and including entry of the Confirmation Order is an Administrative Claim.   Any Claim arising after entry of the Confirmation Order is a Plan Expense.

#### 1.    Administrative Claims

Administrative Claims for goods and services supplied to the Debtors during the Chapter 11 case through and including entry of the Confirmation Order are being paid by the Debtors in the ordinary course of their business.  If you have received payment of such a Claim, there is nothing you need to do in order to retain the payment.  However, the Plan provides that any Administrative Claim still outstanding on the Postpetition Bar Date will not be Allowed or eligible for payment unless it is the subject of a proof of claim or request for payment (or in the case of professional fees and reimbursement of professionals' expenses, an application) filed with the Court on or before the Postpetition Bar Date.  ***The Postpetition Bar Date will be the first business day following the 25th business day after entry of the Confirmation Order.***

A properly filed Administrative Claim will automatically be Allowed (except for professional fees and expenses, which always require Court approval) unless it is objected to by

the deadline established by the Plan: the first business day after the 30th business day following the Postpetition Bar Date.  This deadline may be extended by the Bankruptcy Court.

## 2.    Plan Expenses

Upon entry of the Confirmation Order, the Plan Trustee will take over responsibility for administering the Debtors.  If you supply goods or services to the Plan Trustee, you will be paid by the Plan Trustee in the ordinary course.  ***Please note, however, that in order to be a Plan Expense, the liability must actually be incurred by the Plan Trustee.  The Plan Trustee must receive an invoice not later than 60 days after incurrence of any Plan Expense in order for it to be entitled to payment.  Furthermore, only liabilities of a type payable under Code Section 503(b) can become liabilities of the Plan Trustee.***

## D.    Amendments, Late-Filed Claims, Reconsideration, Unknown Claims

Effective administration of the Plan requires that the Plan Trustee have certainty concerning the obligations of the bankruptcy estate.  Accordingly, the Plan provides that:

- **Amendment of Claims.**  In no event shall the Allowed Amount of any Claim exceed the amount set forth in a required proof of claim therefor filed on or before the Bar Date except to the extent that (i) the claimant, not later than five (5) business days before the Effective Date, files with the Court and serves on the Debtors so as to be received by Debtors' counsel on the same day, an amended proof of claim, and (ii) such amendment is not otherwise barred by law or by Order.  In no event shall the Allowed Amount of any Administrative Claim exceed the amount set forth in a proof of claim or fee application therefor filed on or before the Postpetition Bar Date.

- **Late-Filed or Informal Claims.**  Each Claim as to which a proof of claim was required to be filed on or before the Bar Date or the Postpetition Bar Date, as applicable, and as to which a proof of claim (or fee application) was not filed on or before such date shall not under any circumstances become an Allowed Claim.  A proof of claim or fee application that has not been timely filed shall be of no force or effect whatsoever, including for purposes of any distribution made by the Plan Trustee, without the need for an Order so providing; nor shall any action (including giving notice to the Debtors or otherwise making an "informal" proof of claim) serve for purposes of the Plan and distributions required of the Plan Trustee as a substitute for timely filing a proof of claim.

- **Reconsideration.**  No Order allowing or disallowing a Claim may be reconsidered, pursuant to Code Section 502(j) or otherwise, so as to increase the Allowed Amount thereof after the later of (i) five (5) business days before the Effective Date, (ii) fourteen (14) days after the date an Order allowing such Claim is first entered, or (iii) a date set by Order entered not later than the end of the period established by clause (i) or (ii).

- **Unknown Claims.** Notwithstanding anything to the contrary contained in the Plan, if a Claim is filed with the Court on or before the Bar Date or the Postpetition Bar Date, as applicable, but the proof of claim, fee application or other request for payment of administrative expense, as the case may, is not correctly maintained in the Court's records or otherwise does not come to the attention of the Plan Trustee, acting in good faith, in reviewing or making payment on account of Claims, or if the Court for any reason determines the Bar Date or Postpetition Bar Date to be inapplicable to a particular Claim filed or asserted thereafter, payment thereon shall be made as required by the Plan only to the extent such distribution can be made without requiring disgorgement of any distribution already made.

## VIII.  DISTRIBUTIONS TO CREDITORS

If your Claim is Allowed, you will be entitled to receive a distribution on account of your Allowed Claim as provided by the Plan. No distribution will be made on account of any Claim unless and until it is Allowed as described above. Distributions to creditors will be made by check issued by the Plan Trustee.

### A.  Address for Distributions

If you filed a proof of claim, your distribution check will be sent to the address stated in the proof of claim. If you did not file a proof of claim, your check will be sent to the address listed in the Schedules, which the Debtors prepared based on its books and records. *If a distribution to a particular creditor is returned as undeliverable or if a distribution check remains uncashed ninety (90) days after the date of the check, the distribution will be cancelled. If the creditor does not provide a correct address prior to the point where the Plan Trustee still has funds to make the distribution without requiring disgorgement of any distribution previously made , the creditor will lose the right to any future distributions.* For this reason, it is critical for you to make sure the Plan Trustee has your correct current address.

### B.  Incorrect Address; Change of Address

If your address has changed since you filed your proof of claim, please notify the Plan Trustee of your new address. Similarly, if you did not file a proof of claim and have any reason to believe that the Plan Trustee does not have your correct current address, please notify the Plan Trustee of your address. In addition, if you are the transferee of a Claim, you are required to comply with Fed. R. Bankr. P. 3001(e), and serve a copy of the transfer on the Plan Trustee, so that he may make distributions in accordance with the transfer.

The Plan Trustee's contact information is as follows:

Keith D. Lowey
Verdolino & Lowey, P.C.
Pine Brook Office Park
124 Washington Street

Foxborough, Massachusetts 02035
Tel: (508) 543-1720

Please note that while you are welcome to call the office of the Plan Trustee, *written notice sent to the Plan Trustee by mail is required to notify the Plan Trustee of your address.*

## IX.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.   Rejection of All Remaining Contracts

The Bankruptcy Code provides the Debtors with two options concerning each executory contract and unexpired lease.  The Debtors have the right to assume and assign contracts or leases, or else to reject the contract or lease.  The Plan provides that all executory contracts or unexpired leases that were not disposed of prior to the Effective Date shall be deemed rejected by the Debtors on the Effective Date.  Thus, unless you receive notice to the contrary, your contract will be rejected.

### B.   Damage Claims

In order to assert a claim for damages arising from rejection of an executory contract or unexpired lease, a proof of claim must be filed with the Court on or before the Postpetition Bar Date.

## X.   OTHER PROVISIONS OF THE PLAN

### A.   Binding and Immediate Effect of Confirmation Order

Once the Plan is confirmed, the provisions of the Plan will bind all holders of Claims and interests, whether or not they accept the Plan, and any successors or assigns of such holders.  Provisions of the Plan are not severable, and all parties are conclusively presumed to have relied on each and every provision of the Plan.  Accordingly, *if you have any objection to any provision of the Plan, you must object to confirmation in the manner and within the time described in the notice included with this Disclosure Statement.*

*The Debtors have requested the Bankruptcy Court to specify that its order confirming the Plan (the "Confirmation Order") take effect immediately.*  Under the Federal Rules of Bankruptcy Procedure, a confirmation order will ordinarily be subject to a stay of 14 days before it takes effect.  If you object to the Confirmation Order becoming immediately effective, you should be sure to say so in a timely-filed written objection to the Plan.

The Debtors will file a proposed form of the Confirmation Order not later than [April __, 2018], which is ten business days before Voting/Objection Deadline.  The Confirmation Order will bind all holders of Claims and interests, and any successors or assigns of such holders.  *If you object to any provision of the Confirmation Order, you must file an objection to confirmation of the Plan in the manner and within the time described in the notice included with this*

*Disclosure Statement*.

### B.   Causes of Action

The Plan expressly reserves the right of the Plan Trustee to bring any and all causes of action under Chapter 5 of the Bankruptcy Code, as well as any and all other causes of action and grounds for objection to Claims, except for causes of action or objections against the Noteholder-Related Parties and Debtor-Related Parties which are being released as described below in Section X(F) on page [22].  This reservation of rights applies notwithstanding any action or omission of the Debtors or any statements made or not made in connection with the Plan or this Disclosure Statement.  Accordingly, all parties must assume that the rights of the Plan Trustee to prosecute an action or objection to any Claim by or on behalf of the Debtors will not be limited by reason of *res judicata*, collateral estoppel or any other legal doctrine.

### C.   Discharge

Under the Bankruptcy Code, a corporate debtor that will not conduct business after the effective date of its plan may not receive a discharge of its debts.  Accordingly, the Plan provides that the Debtors will not receive a discharge.  In order to protect against disruption of the distribution and wind-down process, the automatic stay under Section 362 of the Bankruptcy Code will remain in effect until the chapter 11 case is closed.

### D.   Exculpation

The Plan provides:

1.   **Exculpation.  Neither the Debtors nor any of their  current or former directors, officers, employees, agents, attorneys, other professionals, subsidiaries, other affiliated entities,  successors and assigns shall have or incur any liability to any holder of a Claim or interest for any act or omission in connection with, related to, or arising out of the Plan, the disclosure statement therefor, the pursuit of confirmation of the Plan, or any other aspect of the Case, except for willful misconduct or gross negligence.**

2.   **Injunction.  The Debtors expect that the Confirmation Order will include an injunction against commencement or continuation of any litigation barred by the exculpation provision of the Plan.**

### E.   Explanation of Exculpation Clause

By filing an objection to the Plan, parties in interest have a full and complete remedy to object to any provisions of the Plan they think improper, or to the process by which the Plan has been proposed or its acceptance by creditors or confirmation by the Court has been sought.  It is appropriate for such matters, and any other objections to relating to the conduct of the chapter 11 case, to be fully and finally adjudicated in conjunction with confirmation of the Plan.  The exculpation clause reflects the finality of this adjudication by providing that once the

Confirmation Order has been entered, there can be no liability for the Debtors or anyone acting on their behalf for any act or omission in connection with the chapter 11 case.  (Of course, the Debtors will be liable for all Allowed Claims and obligated to comply with the terms of the confirmed Plan.)  The exculpation clause of the Plan relates solely to the chapter 11 case.  Such clauses are standard in chapter 11 plans.

**F.**    **Releases**

The Plan provides :

    **1.**    **Releases by Debtors and Their Estates.**

        **(a)**    **Noteholder-Related Parties.  Effective upon the occurrence of the Effective Date and completion of the transfers pursuant to Section 5.1, the Debtors shall, on their own behalf and on behalf of the Estate, be deemed to forever release and discharge the Noteholder-Related Parties of and from any and all claims, demands, causes of action and the like, arising from any act, omission, event, or other occurrence that occurred on or before the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise.**

        **(b)**    **Debtor-Related Parties.  Effective upon the occurrence of the Effective Date and completion of the transfers pursuant to Section 5.1, the Debtors shall, on their own behalf and on behalf of the Estate, be deemed to forever release and discharge the Debtor-Related Parties of and from any and all claims, demands, causes of action and the like, arising from any act, omission, event, or other occurrence that occurred on or before the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise.**

    **2.**    **Releases by Noteholders.  Effective upon the occurrence of the Effective Date and completion of the transfers required by Section 5.1, the Noteholders shall be deemed to forever release and discharge the Debtors, the Estate, the Plan Trustee and the Debtor-Related Parties of and from any and all claims, demands, causes of action and the like, arising from any act, omission, event, or other occurrence that occurred on or before the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise, including all Note Claims.**

G.    **Explanation of Releases**

In the above-quoted releases, the Noteholder-Related Parties consist of the Noteholders themselves, the entity they formed to receive the PD-1 Assets under the Plan, Intuitive Venture Partners, LLC as collateral agent for the Notes, and their respective current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, investors, members, owners and shareholders, and their heirs, successors and assigns.  The Debtor-Related Parties are the Debtors' current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, and their heirs, successors and assigns.

The releases that are included in the Plan, as quoted above, are a key requirement of the Noteholder Settlement.  As part of a comprehensive resolution of disputes and threatened litigation, the Debtors and Noteholders agreed to exchange releases of all claims against one another, and also claims that the Noteholders contended could be asserted by the Debtors against the Debtor-Related Parties.  It is customary for a comprehensive settlement such as the Noteholder Settlement to include releases of all claims that any party threatened to bring or asserted could be brought.  The Debtors have no reason to believe that the claims they are releasing have any value.  While the Debtors asserted various defenses to the Notes and grounds for recharacterizing the Notes as equity, the Debtors have never contended that they have the right to an affirmative recovery against the Noteholders.  While the Noteholders took the position that the Debtors had claims against their directors, officers and attorneys, the Debtors know of no basis for any such claims nor did the Noteholders supply any.  In sum, the releases to be given by the Debtors do not, in their view, detract from the economic value of the Noteholder Settlement, while the releases that the Debtors will receive under the Plan – including not just claims of the Noteholders based on the terms of the Notes but also unquantified claims for alleged misconduct by the Debtors in relation to the Notes – provide value to the bankruptcy estate if only by reason of laying to rest any potential need to bear the cost of defending claims that the Debtors consider meritless.

Except for the Noteholders, no creditor of the Debtors is giving up any claim against any person or entity pursuant to the Plan.  The Debtors are releasing solely their own claims, not those of any creditor or other third party.

XI.    **ALTERNATIVES TO THE PLAN**

There are no realistic alternatives to the Plan.  Conceptually, two alternatives to the Plan would be (a) for the Debtors to try to dispose of the PD-1 Assets other than under the Plan, or (b) for the chapter 11 cases to be converted to chapter 7 of the Bankruptcy Code, wherein a bankruptcy trustee would be appointed to take charge of the Debtors' bankruptcy estates.  Either approach would almost certainly leave creditors much worse off, with the likely result for general unsecured creditors of receiving no distribution whatsoever.

[With the Noteholder Settlement having been approved, the Debtors must proceed with the Plan approval process or be in breach of the Noteholder Settlement.  If, even so, the Debtors were to breach the Noteholder Settlement by attempting to dispose of the PD-1 Assets other than

pursuant to the Plan, the Noteholders – whose claims were allowed in the aggregate amount of $1,691,776.42 pursuant to the Noteholder Settlement – would have the right to the first $1,691,776.42 of sale proceeds.  In order to have available funds to pay bankruptcy expenses and other creditors the sum of $847,000, which the Plan and the Noteholder Settlement provide for such purposes, the sale price would have to be $2,538,000 – an unlikely result given that XOMA's offer of $1,600,000 is the highest the Debtors have been able to obtain, and even then, there would be additional bankruptcy expenses resulting from pursuit of this approach.  Conversion to chapter 7 would create the same unfavorable economics for the bankruptcy estate, and additional difficulties as well.  In chapter 7 the tasks assumed by the Plan Trustee under the Plan – liquidating any remaining assets, resolving discrepancies in claim amounts (including by objection where warranted), making distributions to creditors, and wrapping up the Debtors' affairs, including final tax returns – would fall instead to a bankruptcy trustee appointed by the United States Trustee (a federal official with administrative responsibilities in bankruptcy cases) along with a new set of lawyers and accountants hired by the bankruptcy trustee.  Under chapter 7 a new deadline to file claims would be set.  The process of claims review and allowance – already far advanced in this case – would begin anew.  In chapter 7, distributions to creditors require orders of the Court and interim distributions (that is, distributions made to holders of Allowed Claims at a time when other claims remain unresolved and the case is not ready to be closed) are the exception rather than the rule.  The Plan, by contrast, permits distributions whenever funds are available, with no need for a court order.  The process for resolving disputes concerning the proper Allowed Amount of a claim is also more cumbersome in chapter 7 than under the Plan.  In sum, the Debtors project that Chapter 7 would cost more money, take more time, and delay distributions to creditors compared with the Plan.]

For the foregoing reasons, the Debtors have determined, and urge their creditors to conclude, that the Plan is superior to all other alternatives

## XII.  RISK FACTORS

[Since the Noteholder Settlement has been approved and the Noteholder Payment is being held by a third party escrow agent, there are no significant risk factors concerning the Debtors' ability to implement the Plan.]

## XIII.  TAX CONSEQUENCES

By reason of substantial net operating loss carryforwards and other tax attributes, the Debtors do not expect to be subject to any substantial taxation by reason of consummation of the Plan or any other transaction of the Debtors.  Implementation of the Plan may result in federal, state or local tax consequences to creditors.  Such consequences are beyond the scope of this Disclosure Statement, in that each creditor's situation is different.  Creditors are urged to consult with their own tax advisors as to specific tax consequences to them resulting from the Plan.

## XIV.  ACCEPTANCE AND CONFIRMATION OF PLAN

### A.    Acceptance of the Plan

The Bankruptcy Code provides that any class of creditors whose rights are "impaired" (that is, not fully honored) under a proposed chapter 11 plan has the right, as a class, to accept or reject the plan.  Each member of the class may vote on this decision.  A class of creditors accepts the Plan if more than one-half of the ballots that are timely received from members of the class, representing at least two-thirds of the dollar amount of claims for which ballots are timely received, are voted in favor of the Plan.

Classes 1 and 3 – consisting of, respectively, Noteholder Claims and General Unsecured Claims– are impaired and may therefore vote to accept or reject the Plan.  Because the Noteholder Settlement provides that the Noteholders must vote to accept the Plan, the Debtors anticipate that Class 1 will vote to accept the Plan.  The Debtors recommend that general unsecured creditors also vote to accept the Plan because, as explained above (see Sections IV(E) and XI), it is the best available alternative and will result in a substantial distribution on account of General Unsecured Claims.

The Debtors will pay in full claims in Class 2 consisting of any Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims.  Class 4, the equity interests of EBHI's shareholders, will likely receive nothing under the Plan and is therefore deemed to reject the Plan.  Therefore, votes are not being solicited from Class 2 or Class 4.

If the Plan is accepted by one of the impaired classes of creditors, disregarding the votes of any insiders included in such class, then the Bankruptcy Code permits the Debtors to request confirmation of the Plan notwithstanding rejection of the Plan by one or more classes. Colloquially this is known as a "cramdown."   The Debtors intend to seek confirmation of the Plan despite its deemed rejection by shareholders, and reserve the right to seek confirmation by means of cramdown if one or more classes of creditors should reject the Plan.  The Debtors believe that they will be able to demonstrate that the Plan meets the standard for cramdown set forth in Section 1129(b) of the Bankruptcy Code as to the shareholders, because no class junior to the shareholders (there is no such class) will receive or retain any property under the Plan and no class senior to the shareholders will be paid more than in full.  Furthermore, the Debtors believe it is likely that the Plan would meet the required standards of Section 1129(b) for cramdown on a creditor class.  Accordingly, any creditor voting against the Plan who wishes to assert that the Plan may not be confirmed if such creditor's class does not accept the Plan is hereby placed on notice of the need to file an objection to the Plan specifically asserting why the standards of Section 1129(b) have not been met (as well as any other ground for objection to confirmation of the Plan), and to appear at the Confirmation Hearing as required of any objector to the Plan (see Section XIV(C), on pages [26-28]  below).

### B.    Voting Procedures

Included in the same envelope containing this Disclosure Statement is a ballot by which holders of Class 1 or 3 Claims may vote to accept or reject the Plan.  You should first review this

Disclosure Statement and the Plan, and then complete the ballot.  Instructions for completing and returning the ballot are found on the ballot itself but are summarized here.

**The Voting Deadline is 4:00 p.m. on [April __, 2018].**

IN ORDER FOR YOUR VOTE TO COUNT, IT MUST BE RECEIVED BY THE DEBTORS' COUNSEL NOT LATER THAN THE VOTING DEADLINE.  Submission of ballots by electronic mail, telefacsimile, or any means not including an authorized signature in ink, is prohibited.

All votes to accept or reject the Plan must be cast by using the ballot provided, or a copy of the ballot provided.  The ballot must be signed by the creditor, or an officer, partner or authorized agent of the creditor.  Ballots signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity should indicate such capacity and be accompanied by proper evidence satisfactory to Debtors' counsel of their authority to so act.  Please be sure to fill in the name of the creditor on whose behalf the ballot is being filed.

On each ballot there is a space in which to write the Class in which your claim belongs and the amount you believe is the amount of your claim.  These figures are solely for reference.  If the Class or amount you fill in differs from the correct Class or actual Allowed Amount of your Claim, then the correct Class and actual Allowed Amount will be used in tabulating your vote.  Also, please be aware that **the amount of the Claim specified on your Ballot will not constitute, supersede or amend any proof of claim for your Claim.**

If an objection to your Claim is pending, your vote will not count unless you file, and the Court grants, a motion under Rule 3018 of the Federal Rules of Bankruptcy Procedure for your Claim to be temporarily allowed for voting purposes.  Any such motion must be filed not later than the Voting Deadline, unless the Court determines otherwise.

C.   <u>Confirmation of the Plan</u>

The Bankruptcy Court must hold a confirmation hearing before deciding whether to confirm the Plan.  Upon entry of the Confirmation Order, the Effective Date of the Plan will occur two business days after entry of the Confirmation Order.  However, one aspect of the Plan will occur immediately:  The Plan Trustee will take over the powers and duties of the Debtors' directors and officers as soon as the Confirmation Order is entered.  This will permit the Plan Trustee to finish the process of reconciling claims and be ready to make distributions on the Initial Distribution Date.  For this reason, the Debtors intend to request that the Confirmation Order take effect immediately, such that the otherwise-applicable 14-day stay supplied by Rule 3020(e) of the Federal Rules of Bankruptcy Procedure will not apply.

The hearing on confirmation of the Plan, and on any objections to the Plan, will be held on [April __, 2018 at __:__ _.m.], before the Honorable Frank J. Bailey, in Courtroom 3, 12th floor, John W. McCormack Post Office and Court House, 5 Post Office Square, Boston, Massachusetts (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from

time to time by the Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment of that hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.  Any objection to confirmation of the Plan must be in writing, and filed with

> Clerk's Office
> United States Bankruptcy Court
> John W. McCormack Post Office and Court House
> 5 Post Office Square
> Suite 1150
> Boston, MA 02109-3945.

The objection must also be served on the parties below so that they actually receive it not later than the time it is filed with the Court:

| Counsel to the Debtors: | Daniel C. Cohn, Esq. Murtha Cullina LLP 99 High Street Boston, MA 02110 |
|---|---|
| United States Trustee: | Eric K. Bradford, Esq. Office of the United State Trustee 5 Post Office Square Suite 1000 Boston, MA 02109 |
| All other parties requesting notice in these Chapter 11 cases | Addresses on file with the Court. |

Objections must be filed and served by not later than **4:00 p.m. on [April   __, 2018]** (same as the Voting Deadline).

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.** Furthermore, in order to pursue an objection, *the objector must also attend the Confirmation Hearing*, either in person or through counsel, except that certain entities such as corporations may appear only through counsel.  Otherwise, the objection will be deemed to have been waived even if it was timely filed and served.

The Debtors reserve the right, in order to resolve any objection to confirmation of the Plan or otherwise, to modify the Plan without further notice or disclosure, so long as the modification does not adversely change the treatment of any creditor who has not accepted the modification.

The Plan will be confirmed if it meets the requirements set forth in the bankruptcy law. The most significant of these requirements include:

- *Assenting Impaired Class.* The Plan must have been accepted by at least one impaired class of Claims, disregarding votes of insiders.

- *Acceptance and Cramdown.* All impaired classes must have accepted the Plan, except that if any class does not accept the Plan and any member of the class objects on the basis that the Plan does not meet the requirements for cramdown, the Debtors must persuade the Court to determine that the Plan does meet the cramdown requirements. The requirements for cramdown are that the Plan must be fair and equitable to, and not unfairly discriminate against, the objector's class.

- *Classification.* If the holder of a Claim objects to classification of such Claim, including that the Claim was placed in an impermissible class or that another Claim was impermissibly placed in the same class as such Claim, the Court must find that such Claim was permissibly classified. In general, a class may only include claims with the same legal rights.

- *Best Interests of Creditors.* If any creditor does not accept the Plan and objects on the basis that the Plan does not provide such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation, the Court must find that the Plan does supply such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation.

- *Feasibility.* If any creditor objects on the basis that confirmation of the Plan is likely to be followed by the need for liquidation or further reorganization, other than as contemplated by the Plan, then the Court must find that the Plan is not likely to be followed by the need for liquidation or for further reorganization except as contemplated by the Plan. In this regard, the Plan by its terms provides for the liquidation of the Debtors.

The Debtors believe that the foregoing requirements are or will be met. If the Court determines that all confirmation requirements are satisfied, it will enter an order confirming the Plan. The Debtors' proposed form of Confirmation Order will be on file with the Court not later than [April __, 2018]. You may obtain a copy by contacting Debtors' counsel; the best way is by email to jhorne@murthalaw.com.

## XV.    <u>CONCLUSION</u>

**The Debtors urge all creditors to vote for and support the Plan, on the basis that the Plan is beneficial to all creditors.** For general unsecured creditors, the Plan provides the best opportunity for a speedy and substantial recovery.

Respectfully submitted,

ENUMERAL BIOMEDICAL HOLDINGS, INC.,
ENUMERAL BIOMEDICAL CORP. and
ENUMERAL SECURITIES CORPORATION,


Dated:  March 14, 2018                    By _____

                                             Kevin G. Sarney,
                                             Interim President & CEO

## **EXHIBIT 1**

# **Debtor's Chapter 11 Plan Dated March 14, 2018**

**[*To be inserted*]**